IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JUBAL L. ROWTON,                          )    Civil No. 3:10-cv-01435-JE
                                          )
                        Plaintiff,        )    FINDINGS AND
                                          )    RECOMMENDATION
            v.                            )
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security,          )
                                          )
                        Defendant.        )
_____ )

        David B. Lowry
        Attorney at Law
        16200 SW Pacific Hwy,
        Suite H-233
        Portland, OR 97224

            Attorney for Plaintiff

FINDINGS AND RECOMMENDATION - 1

S. Amanda Marshall, U.S. Attorney
Adrian L. Brown, Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

David J. Burdett
Social Security Administration
Office of the General Counsel
701 Fifth Avenue, Suite 2900, M/S 221A
Seattle, WA 98104

    Attorneys for Defendant

JELDERKS, Magistrate Judge:

  Plaintiff Jubal Rowton brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision of the Commissioner of Social Security (the Commissioner) denying his applications for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Benefits (SSI) under Titles II and XVI of the Social Security Act (the Act). Plaintiff seeks an Order reversing the decision of the Commissioner and remanding the action to the Social Security Administration for an award of benefits.

  For the reasons set out below, the Commissioner's decision should be affirmed.


**Procedural Background**

  Plaintiff filed applications for DIB and SSI on April 27, 2007, alleging that he had been disabled since February 22, 2005, because of an inability to lift above his head, limited range of motion in his neck, and numbness, tingling, swelling, and weakness in his hands.

  After his applications were denied initially and upon reconsideration, Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ). On July 21, 2009, a hearing was held before ALJ Moira Ausems. During the hearing, the ALJ and Plaintiff's counsel agreed that

FINDINGS AND RECOMMENDATION - 2

Plaintiff should undergo a consultative examination after the hearing, and Plaintiff was subsequently examined by Dr. Kurt Brewster on August 28, 2009.

After reviewing the results of Dr. Brewster's examination, on September 23, 2009, ALJ Ausems issued a decision finding that Plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on November 10, 2010, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff seeks review of that decision.

**Factual Background**

Plaintiff was born on October 16, 1956. He was 48 years old at the time of his alleged onset of disability, and was 52 years old at the time of the hearing before the ALJ. Plaintiff completed high school, was trained in carpentry in the Job Corps, and has past relevant work as a dry wall applicator, a carpenter helper, and a plumber helper. He has not worked since February 22, 2005.

**Disability Analysis**

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is

FINDINGS AND RECOMMENDATION - 3

not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three.  20 C.F.R. § 404.1520©.

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1.  A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2.  If the

Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled.  If the Commissioner does not meet this burden, the claimant is disabled.  20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant.  Tackett, 180 F.3d at 1098.  At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy.  Id.

**Medical Record**

Plaintiff fractured the base of his fifth right metacarpal in October, 1980.  After the injury was treated by a closed reduction, Plaintiff attempted to return to work in November and December, 1980 and February and April, 1981.  He stopped that effort each time after developing pain in his right wrist.  Plaintiff had surgery on his right wrist for an arthrotomy and excision of a torn triangular ligament in July, 1981.  He fractured his right fifth metacarpal again in September, 1981.

Plaintiff was seen by Dr. Thomas Thrall on February 23, 2005, for complaints about problems with his right hand.  Plaintiff told Dr. Thrall that he had used an air-powered screw gun during the previous month while  installing cabinets in recreational vehicles.  He denied any specific injury, and complained of numbness with mild swelling in his right hand and during the previous month.  Dr. Thrall noted some puffy swelling on the dorsum of Plaintiff's right hand.  Plaintiff had good range of motion in his fingers and slightly reduced range of motion in his right wrist.  Sensation in Plaintiff's fingers was diffusely reduced on both the palmar and dorsal aspects in all five fingers.  Plaintiff's hand grip strength was 4/5 and his finger intrinsic strength was reduced with abduction.  Tinel's and Phalen's tests for the right wrist were negative.

FINDINGS AND RECOMMENDATION - 5

Dr. Thrall diagnosed Plaintiff with recent onset right hand paresthesias and weakness of unknown origin.  He indicated that he would put Plaintiff on modified duty precluding use of the screw gun to determine if that would make a significant difference.  During a follow up visit the following week Plaintiff reported that he had experienced cramping in his hand a few times during the previous week, and that though his numbness had improved, his entire hand continued to be achy and sore.  A Phalen's test was positive, and the doctor opined that Plaintiff might have a compressive neuropathy, and that Plaintiff's smoking and repetitive use might be causing a problem in the "already compromised" ulnar nerve canal where surgery had been performed earlier.  Plaintiff was advised not to use a screw gun or perform strenuous or repetitive grasping, and was advised to follow up after nerve conduction studies and EMG's were performed.

Dr. Randall Jura examined Plaintiff on December 28, 2005.  Plaintiff told Dr. Jura that he had worked at River Forest RV, a recreational vehicle manufacturer, for two months, had been put on light duty after complaining of symptoms in his right hand, and was then terminated without explanation.  Plaintiff said that he had experienced increasing neck pain during the previous year, and that his right hand and the ulnar side of his wrist had bothered him since the previous winter.

Dr. Jura noted that Plaintiff had reduced range of motion in his cervical spine.  He opined that Plaintiff might have developed cervical spine degeneration and spondylosis as a result of his work as a drywaller.  Dr. Jura noted some right elbow tendonitis, and diagnosed Plaintiff with cervical/thoracic lumbar facet syndrome and cervical spondylosis with myelopathy.

Dr. Jura saw Plaintiff again on February 1, 2006, after he had obtained X-rays of Plaintiff's cervical spine.  He opined that the X-rays showed severe degenerative changes in

Plaintiff's cervical spine.  Dr. Jura signed a report stating that Plaintiff had been disabled since December 28, 2005, and stated that Plaintiff "has full time loss until further notice."

On March 9, 2006, Dr. Anthony Pappas, a radiologist, attempted to take an MRI of Plaintiff's cervical spine at Dr. Jura's request.  He could not obtain a useable image because Plaintiff was unable to remain motionless.

On March 11, 2006, after having two chiropractors review Plaintiff's X-rays, Dr. Jura concluded that Plaintiff's condition had not improved, and that Plaintiff continued to be unable to work.

Plaintiff was incarcerated in the Polk County Jail from April 3, 2006, through June 28, 2006.  During that time, Plaintiff complained of neck pain and said that he had earlier suffered a severe neck injury.  On April 17, 2006, a medical examiner found that Plaintiff's neck was "mobile w/o spasms."  On May 20, 2006, an examining physician noted that Plaintiff's grip strength was intact, diagnosed Plaintiff with possible cervical arthritis, and continued him on 800 milligrams of Ibuprofen.

On June 15, 2006, Plaintiff complained that he had hurt his neck the previous day.  He was given 500 milligrams of Naproxen.  Plaintiff continued to complain of neck and shoulder pain later that month, and on June 21, 2006, was noted to have a large hard bump on his right clavicle.  An X-ray taken a week later showed a transverse fracture through the mid-shaft of Plaintiff's right clavicle, with the inferior fragment displaced one-half shaft width.  Plaintiff complained that an attempt to put a splint on the fracture caused too much pain, and found it felt better without support.  He was given an ice pack and 1000 milligrams of APAP.

As part of an evaluation of Plaintiff's worker's compensation claim, Dr. Lynne Bell, a neurologist, performed an independent medical evaluation on August 17, 2006.  Dr. Bell

FINDINGS AND RECOMMENDATION - 7

reviewed Plaintiff's medical history.  She noted that Plaintiff complained of neck pain at a level

of 4 to 7 on a 10 point scale, and that Plaintiff also complained of aching in his right forearm.

On examination, Dr. Bell noted tenderness in Plaintiff's spine and paraspinals bilaterally at the

C5-6 level.  Spurling's maneuver was negative bilaterally.  Plaintiff exhibited positive Waddell's

signs on cervical compression and traction, both of which aggravated Plaintiff's mid-neck pain.

Dr. Bell found that Plaintiff's range of motion was markedly limited, with flexion of 30 degrees,

extension of 55 degrees, lateral bending of 20 degrees bilaterally, and rotation of 10 degrees

bilaterally.  With distraction, Plaintiff was able to rotate his neck 65 degrees bilaterally.  Range

of motion in Plaintiff's shoulders was limited to 140 degrees of forward flexion because of

Plaintiff's complaints of aggravation of posterior neck and upper thoracic pain, and abduction

was limited to 20 degrees bilaterally by posterior neck and interscapular discomfort.  Dr. Bell

noted significant weakness in 5th digit abduction on Plaintiff's right hand and weakness of the

first dorsal interosseous region on Plaintiff's left, as well as questionable weakness of the distal

flexors on the right.  Plaintiff appeared to have some wasting in the first dorsal interosseous

region bilaterally, with no fasciculations.  Plaintiff's grip strength was 55 pounds on the right

and 80 pounds on the left.  Plaintiff could not activate the ulnar digits when performing grip

testing.  His pinch strength was 16 pounds on the right hand and 15 pounds on the left, and his

reflexes were 2+ and symmetrical at the biceps, triceps, and brachioradialis.

Dr. Bell reported that Phalen's test caused Plaintiff to complain of paresthesias in the

ulnar innervated fourth and fifth digits on the right, and that Plaintiff had positive Tinel's sign

overlying the ulnar nerves at both elbow and radiating paresthesias into the right fourth and fifth

digits bilaterally.  Plaintiff had positive Tinel's test overlying his left wrist radiating into his

middle and index fingers, and negative Tinel's test at the right wrist.  Sensory testing showed

diminished sensation to pinprick in the ulnar aspect of Plaintiff's hand. Two point discrimination was within normal limits at 5-6 mm in the 4th and 5th digits and 4-5 mm in the remaining digits of Plaintiff's right had. It was normal at 4mm in all digits of Plaintiff's left hand.

Plaintiff's lower extremity strength was 5/5, and lower extremity sensory testing was normal. Plaintiff's gait was normal. He could walk on his heels and toes and tandem walk, and Romberg's test was negative. Plaintiff had symmetrical 2+ reflexes at the knees and ankles, and no ankle clonus.

Dr. Bell opined that a palpable lump on Plaintiff's right clavicle was probably the result of an old fracture. She reported that X-rays of plaintiff's cervical spine taken in December, 2005 showed significant cervical degenerative disc disease with disc space narrowing at C3-4, C4-5, and C5-6, with posterior osteophyte spurring at all three levels. No significant foraminal stenosis was seen. Dr. Bell noted that a radiological report from January, 2006 had shown no evidence of instability and no focal limitation of motion.

In her summary of Plaintiff's complaints, Dr. Bell opined that

The source of his neck pain is clearly his cervical spondylosis, which is an idiopathic condition related to genetics and the effects of aging (i.e., arthritis in the neck). With respect to the hand pain, it is noted that he has a prior history of a fifth metacarpal fracture, which was previously documented to be associated with significant chronic hand pain and limitations in repetitive use of the hand. He himself reports that he has had symptoms in his hands associated with the use of vibratory tools in the past even when working as a drywaller consisting of cramping and paresthesias.

On today's exam, however, he has clear weakness of the ulnar innervated intrinsic muscles of the hands primarily affecting abductor digitii minimi and lumbricals. However, there appears to be sensory loss and weakness of more proximally innverrated regions that suggest that his entrapment is more likely to be at the level of the elbows rather than at the level of the hand as was suggested by Dr. Tsang.

FINDINGS AND RECOMMENDATION - 9

Unfortunately, the nerve conduction studies and EMG studies recommended by Dr. Tsang were never obtained. It would be important to obtain bilateral nerve conduction studies with detailed testing of the ulnar and median nerves as well as EMG assessment to determine to what extent his hand weakness might be attributable to cervical radiculopathy, proximal ulnar nerve entrapment, multi-entrapment neuropathy, or focal entrapment at the area of the hand related to his prior trauma and surgery.

At the request of the Agency, Dr. Minhao Zhou reviewed Plaintiff's medical records and examined Plaintiff on March 10, 2007. Dr. Zhou opined that Plaintiff had significant radiologic findings of degenerative changes and spondylosis in his neck, and noted that the range of motion in his neck and shoulders was significantly limited. Dr. Zhou reported that Plaintiff had positive Tinel's sign and indications of possible carpal tunnel syndrome.

Dr. Zhou evaluated Plaintiff's functional capacity. He opined that Plaintiff could be expected to stand and walk for 6 hours in an 8 hour work day, sit for 6 hours in an 8 hour work day, and lift and carry 10 pounds frequently. Dr. Zhou attributed these limitations primarily to the decreased range of motion in Plaintiff's neck and shoulders, slight decrease in grip strength, and positive Tinel's sign which indicated possible carpal tunnel syndrome. Dr. Zhou opined that Plaintiff was limited to occasional stooping, bending, and crouching, and that his manipulation was limited to occasional reaching and handling.

As noted above, following the hearing before the ALJ, the Agency referred Plaintiff to Dr. Kurt Brewster for a consultative examination. Dr. Brewster examined Plaintiff on August 28, 2009. Dr. Brewster characterized Plaintiff as cooperative, but found he was a poor historian who did not know the details of his "alleged chronic problems."

Dr. Brewster reported that Plaintiff complained of severe bilateral hand pain which had started during the 1980's. He reported that Plaintiff said that he had experienced pain in his left shoulder since 1995, then changed that date to 2005, and when asked to point out the area

FINDINGS AND RECOMMENDATION - 10

affected, pointed to his <u>right</u> cervical paraspinal area.  Plaintiff also stated that he had had

headaches daily since 2005.  Dr Brewster reported that Plaintiff said he performed all of his self-

care activities, including bathing and washing his hair, could dress himself 20% of the time and

tie his shoes 50% of the time, did housework for 30 minutes per day with no limitations in

activities such as washing dishes, could sweep, vacuum, and do laundry 20% of the time, could

feed himself 20% of the time, and did not fold clothes or cook.  Plaintiff said that, because of arm

and hand pain, he could not write, and that pain in the shoulders prevented him from reaching

above his head and 80% of the time made it impossible for him to pick up something that had

dropped.  Plaintiff said that, because of pain in his shoulder, he could pick up a can of soup only

20% of the time, and could not pick up a telephone book (3 pounds) or a gallon of milk (8

pounds).  However, he said that he could pick up a one-year old baby (average 22 pounds) 20% of

the time.  Plaintiff said that, because of back pain, he only could stand for 3 hours and walk for 2

hours in a day.   He reported that he watched television 12 hours per day, and did not read, spend

time on the computer, study, or drive.

On examination, Plaintiff complained of greater pain in his right trapezius than in his left,

and reported radicular sensation to his ear during right trapezius palpation.  He reported pain to

palpation over his cervical spinal area.  Waddell's axial loading produced neck pain.  Tinel's test

produced a focal shocking sensation, and Phalen's test produced pains only in Plaintiff's wrists.

Dr. Brewster reported that Plaintiff could tandem walk, walk on his heels, and tiptoe without

apparent difficulty, and that his straight-leg raising test was negative.  Plaintiff was able to pick

up a paper clip from a flat surface and transfer it bilaterally.  Range of motion in his lumbar spine,

cervical spine, shoulders, and wrists was reduced.

FINDINGS AND RECOMMENDATION - 11

Motor strength in Plaintiff's upper extremities was largely intact, except in his left wrist. His grip strength was 40 pounds on the left and 60 pounds on the right. Dorsiflexion in Plaintiff's ankles was reduced. Plantar flexion was normal, and strength in Plaintiff's lower extremities was normal. Sensory testing to light touch was normal in all areas tested. Plaintiff's deep tendon reflexes were 0/4 bilaterally in the biceps and brachioradialis, 2/4 bilaterally at the patellas, and 0/4 at the Achilles.

Dr. Brewster reported that Plaintiff

had no evidence of atrophy and right forearm was appropriately increased for dominant hand. The claimant was noted to pull up sleeves with both hands equally without apparent difficulty and pick up and transfer without problem.

Overall, given the claimant's poor acquaintance with his own symptoms and history, his uncertainty even to which side has had surgery (apparently right), inconsistencies during activities of daily living estimates and lack of findings on exam, do not have basis to significantly limit claimant to the degree estimated.

Occasional lifting, reaching, grasping and pulling restrictions on the right reasonable given prior triangular ligament tear and 5th MC fracture. While he has an old, well-healed right clavicle fracture, this did not impair ROM on exam.

In his summary of Plaintiff's functional capacity, Dr. Brewster concluded that Plaintiff had no lifting and carrying restrictions on his left hand, and could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds with his right hand. He reported that Plaintiff could sit/stand 6 hours in an 8 hour work day, and had no restrictions for sitting. Dr. Brewster indicated that Plaintiff could frequently reach, handle, finger, feel, and push/pull with his left hand, and could frequently reach, finger and feel, and occasionally handle and push/pull with his right hand. He reported that Plaintiff could frequently climb stairs, ramps, ladders and scaffolds, and could frequently balance, stoop, kneel, crouch, and crawl.

**Hearing Testimony**

**Plaintiff**

Plaintiff testified as follows during the hearing before the ALJ.

Plaintiff worked as a drywall installer, which included work as a steel framer, from 1994 to 2000.  From 2000 until 2005 he worked as a carpenter, appraising and installing HVAC equipment for a plumbing contractor.  During 2005 he worked building cabinets for mobile homes and camp trailers.

In February, 2005, Plaintiff's hands began to swell whenever he tried to do anything, and after a few minutes he was unable to hold anything.  He could not lift anything over his head with his left arm, and he often had muscle spasms in his hands.  Though his hands had hurt before, he had been able to work until that time.  At the time of the hearing, Plaintiff had problems with his right shoulder, but had greater pain in his left shoulder.  Plaintiff broke his collarbone while he was incarcerated.

Plaintiff had not received medical treatment during the recent period before the hearing because he had no money.  He had been denied state aid and treatment.  Plaintiff had been incarcerated for assault, but charges were dismissed because his physical condition would not have allowed him to hit anyone.  Though his low back was uncomfortable, Plaintiff did not think that he had a back problem.

Plaintiff could sit in a recliner for some time, but can sit in a hard-backed chair for only 15 minutes.  He could stand for 30 minutes, but then needed to sit for at least 5 minutes.  Plaintiff had problems with his right leg, which occasionally gave out on him, and with his right foot and ankle.  He had broken that foot some years ago.

Plaintiff could not reach overhead with his left arm, and had difficulty gripping because of hand weakness.  He started having trouble with his hands in 2005, and had been unable to play his guitar or to ride his bicycle more than 5 minutes at a time since then.  Plaintiff had numbness in his hands 70-80% of the time.  Using his hands made them worse, and caused them to tingle and swell.

Plaintiff had problems with his neck, and sometimes had to roll out of bed because he could not lift his head or shoulders.  Neck problems made it difficult for him to look up or to the sides, and would make it difficult to look down at a table to perform bench work.

Plaintiff had significant pain in both shoulders, and had experienced blackouts and dizziness.  He had headaches, with sharp pains up the back of his head which sometimes went into his ears.

Plaintiff had experienced health problems in 2005 while working for his last employer, and thought that was why he had been terminated.  Dr. Juba, his doctor, had told him not to work.

Plaintiff's condition worsened after he stopped working.  Since then, he had experienced more problems with lifting, standing, trying to get around, and doing the little things he used to do.  He slept an average of 6 hours a night, and was stiff and slow when he got up in the morning.  He took a 30 minute nap at least once a day.

Plaintiff estimated that he did 10-12% of the housework in his household.  He swept occasionally, and could not make the bed.  He used to play golf and softball, but could no longer do so.

Plaintiff estimated that, if he could take all the breaks he needed, he would be able to work about 3 hours a day.  He usually changed position every 15-30 minutes, and had trouble stooping

or bending at the waist.  Plaintiff rated his daily pain at 6 to 7 on a 10 point scale in which 10 was the worst pain imaginable.  Because of pain, he could not function 60-70% of the time.

**Vocational Expert (VE)**

The VE characterized Plaintiff's past relevant work as a drywall applicator as very heavy, skilled work which had an SVP rating of 7.  He characterized Plaintiff's past relevant work in positions as a carpenter's helper and a plumber's helper as very heavy, semiskilled work with an SVP of 4.

The ALJ posed a vocational hypothetical describing an individual with Plaintiff's education and experience, and was a "younger individual" (age 18-44) on the date of Plaintiff's alleged onset of disability and was closely approaching advanced age (45-49) on October 16, 2006.  The individual described could lift 20 pounds occasionally and lift 10 pounds frequently, could stand and walk 6 out of 8 hours in a work day, was limited to occasional pushing and pulling with upper extremities, could never climb ladders, ropes or scaffolds, could occasionally climb stairs or ramps, balance, stoop, kneel, crouch, or crawl, could occasionally reach overhead with the upper extremities, and could frequently reach in all other directions.  The individual could frequently handle, finger, and feel, and needed to avoid concentrated exposure to vibration.

The VE testified that an individual with these restrictions could not perform any of Plaintiff's past relevant work, but could work as a guard/security, a meter reader, or hotel clerk. The VE characterized the all of these as light exertion level positions with an SVP of 2.  He testified that, though the guard/security and meter reader positions were listed as SVP level 3 positions, his research indicated that they could be learned in 30 days or less, which was "tantamount to SVP two, unskilled work."  The VE further testified that, though the hotel clerk position was listed as an SVP 4 position, his research also indicated that it could be learned in 30

days or less, so it was also the equivalent of an SVP 2 position. He stated that these conclusions were based upon the Department of Labor's Occupational Projections and Training Data, published in 2008, and the Oregon Department of Labor's Employment Projections by Industry and Occupations, 2006-2016, published in 2007, and upon his own labor market research.

The ALJ then asked the VE to consider an individual with the RFC set out above who was limited to occasional reaching in all directions, handling, fingering, and feeling. The VE testified that this added restriction would eliminate the hotel clerk position, which required frequent fingering, and the meter reader position, which required frequent reaching and handling. He added that the SCO/DOT, an addendum to the 1993 DOT, indicated that the guard/security position required frequent reaching and handling, but that his own labor market research and on-site job analysis indicated that this position instead required reaching and handling only at the lower end of the occasional range.

The ALJ then asked the VE to consider an individual who, as Plaintiff testified, could not sit for more than 15 to 30 minutes at a time, had upper extremity and hand limitations that would preclude even occasional reaching, handling, and feeling, had limitations in standing and walking, and required frequent breaks. The VE responded that an individual with the limitations described by Plaintiff could perform no competitive work.

Plaintiff's counsel then asked the VE to provide the names and addresses of employers who hired the kind of security guards he had described, or to at least indicate the towns in which 5 or 6 such employers were located. The ALJ told counsel that this was not an appropriate line of questioning because it was "not the role of our Vocational Expert . . . to identify specific employers."

FINDINGS AND RECOMMENDATION - 16

**ALJ's Decision**

At the first step of her analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 22, 2005, the date of the alleged onset of disability.

At the second step, the ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease of the cervical spine with spondylosis; a history of remote right fifth metacarpal fractures and right wrist torn triangular ligament status post surgery; a history of right carpal tunnel syndrome status post release; a history of remote left wrist fracture status post surgery; mid-lumbar dextro-convex scoliosis with spondyloslisthesis of L5 and S1, and cervicalgia.

At the third step of her analysis, the ALJ found that Plaintiff's severe and non-severe impairments, either alone or in combination, did not meet or equal a presumptively disabling impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

The ALJ next evaluated Plaintiff's residual functional capacity (RFC).  She found that Plaintiff

> Has the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk 6 hours in an 8 hour workday, and sit 6 hours in an 8 hour workday.  The claimant is limited to using his upper extremities bilaterally for no more than occasional pushing and/or puling.  He is precluded from climbing ladders, ropes, and scaffolds, but is able to perform occasionally all other postural movements.  The claimant is limited to no more than occasional overhead reaching bilaterally and not more than frequent reaching in all other directions.  He can perform fine motor tasks such as handling and fingering frequently, but not constantly.  The claimant should avoid concentrated exposure to vibration.

The ALJ found that Plaintiff's statements concerning the severity of his symptoms and impairments were not credible to the extent they were inconsistent with her evaluation.

FINDINGS AND RECOMMENDATION - 17

At the fourth step of her analysis, the ALJ found that Plaintiff could not perform his past relevant work.

Based upon the testimony of the VE, at the fifth step, the ALJ found that Plaintiff could work in "occupations such as guard security," as a meter reader, or as a hotel clerk.  She found that the VE's testimony was consistent with the Dictionary of Occupational Titles, except to the extent that the VE had reduced the number of estimated positions that would be available to exclude those that would require an individual to stand or walk for more than 6 hours in an 8 hour workday, and to the extent that the VE's assessment of SVP levels differed from those noted in the DOT.  The ALJ noted that the VE had identified the sources of information that supported his conclusions as to the appropriate SVP levels.

Based upon her conclusion that Plaintiff could perform "other work" that existed in substantial numbers in the national economy, the ALJ found that Plaintiff was not disabled within the meaning of the Act.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

FINDINGS AND RECOMMENDATION - 18

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ failed to properly assess his credibility, erred in rejecting lay witness testimony, improperly assessed his RFC, failed to support her findings at the fifth step of the disability analysis, and denied his right to a full and fair hearing.

### 1. **ALJ's Credibility Determination**

As noted above, the ALJ found that Plaintiff's statements concerning the severity of his symptoms and impairments were not credible to the extent they were inconsistent with her evaluation of his RFC. Plaintiff contends that the ALJ did not provide the required support for this conclusion.

### Assessment of a Claimant's Credibilty

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). If a claimant produces medical evidence of an underlying impairment, the ALJ  may not discredit

the claimant's testimony concerning the severity of symptoms merely because it is not supported

by objective medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citing

Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1990)(en banc)).  If a claimant produces the

requisite medical evidence and there is no evidence of malingering, an ALJ must provide specific,

clear and convincing reasons, supported by substantial evidence, to support a determination that

the claimant was not wholly credible.  Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002);

SSR 96-7p.   If substantial evidence supports the ALJ's credibility determination, that

determination must be upheld, even if some of the reasons cited by the ALJ are not correct.

Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1162 (9th Cir. 2008).

An ALJ must examine the entire record and consider several factors, including the

claimant's daily activities, medications taken and their effectiveness, treatment other than

medication, measures other than treatment used to relieve pain or other symptoms, and "any other

factors concerning the individual's functional limitations and restrictions due to pain or other

symptoms."  SSR 96-7.  An ALJ may support a determination that the claimant was not entirely

credible by identifying inconsistencies between the claimant's complaints and the claimant's

activities of daily living.  Thomas, 278 F.3d at 958-59 (9th Cir. 2002).

**Analysis**

The ALJ here concluded that Plaintiff had medically determinable impairments that could

be expected to cause some of the symptoms alleged, but that Plaintiff's statements regarding the

severity of his impairments were not wholly credible.  She first noted that, though Plaintiff had

asserted that he was substantially impaired by problems with his right hand in the early 1980's,

"[M]ultiple physicians determined that he could perform light to medium work as defined by [the]

Dictionary of Occupational Titles (DOT) as of 1982."  She next noted that, though Plaintiff

FINDINGS AND RECOMMENDATION - 20

complained of a severe neck injury while he was incarcerated in the Polk County Jail, a physical examination indicated that his neck was "mobile without spasm and non-tender." Though Plaintiff complained of problems with his neck several weeks later, examination again disclosed no problem. The ALJ noted that, though Plaintiff had complained of significant neck pain during an examination in March, 2007, Dr. Zhou noted that Plaintiff's neck was supple and non-tender on examination, and opined that that no kyphosis, scoliosis, or lordosis was present.

The ALJ cited inconsistencies between Plaintiff's description of his limitations and impairments and the objective medical evidence, and inconsistent statements Plaintiff had made to medical providers. She noted that Plaintiff had pointed to the wrong shoulder when Dr. Brewster asked where he had pain, and that Dr. Brewster reported that Plaintiff had given conflicting accounts of his limitations and had found no clinical abnormalities that supported Plaintiff's allegations of constant pain and "extreme functional limitations."

The ALJ concluded that Plaintiff's allegations were

> less than fully credible because he has made inconsistent statements regarding his conditions, the severity of his symptoms, and the limitations caused by those symptoms. The claimant is unclear where his pain is, as noted in Dr. Brewster's report. He has alternating stories about whether he had bilateral wrist pain in the 1980s, as of 2005, or more recently; whether he has had continuous pain in his wrist, hand, and neck, or whether symptoms have emerged over time; and what kind of treatment he has received for his complaints. The claimant has alleged having bilateral shoulder surgery, but there is no evidence of this surgery as far back as 1981, and, while it is possible that a man under the age of 24 could have surgery and the procedure simply predates the provided records, it is not probable. Of note, he specifically stated that he had no shoulder related symptoms during his evaluations in 1981. The clamant reports good improvements of his symptoms after procedures, but later claims that he never had any relief. He has had very infrequent medical treatment . . . .

The ALJ provided clear and convincing reasons for concluding that Plaintiff was not wholly credible, and those reasons were supported by substantial evidence in the medical record.

FINDINGS AND RECOMMENDATION - 21

The consistency of a claimant's statements, "both internally and with other information in the case record" is a "strong indication of the credibility of an individual's statements," SSR 96-7, and contradictions between a claimant's statements and the medical record provide a proper basis for discounting a claimant's credibility.  E.g., Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008).  Though a claimant's subjective testimony concerning pain cannot be rejected solely because it is not fully corroborated by medical evidence, such evidence is a relevant factor in determining the severity of a claimant's pain and impairments.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ here adequately supported her conclusion that Plaintiff's statements concerning the severity of his symptoms and impairments were not wholly credible.

2. **Lay Witness Credibility**

Paula Firestone, Plaintiff's girlfriend, submitted a form describing her observations concerning Plaintiff's functioning.  The ALJ summarized Ms. Firestone's statements in detail, and ultimately concluded that they, like Plaintiff's own statements, were not wholly credible.  The ALJ characterized Ms. Firestone's functional report as "identical to that of the claimant." Accordingly, she applied her "assessment of the claimant's credibility" to Ms. Firestone's statements as well, concluding that "[h]er parroting of his allegations does not add to their credibility."

Plaintiff contends that the ALJ did not provide a legally sufficient basis for discounting Ms. Firestone's statements.

I disagree.  An ALJ must provide reasons that are "germane" for discounting the statements of third party witnesses.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005). Here, the ALJ fairly characterized Ms. Firestone's statements, which were substantially similar to

FINDINGS AND RECOMMENDATION - 22

Plaintiff's own, properly discounted, description of his limitations.  The ALJ's observation that Ms. Firestone's statements "parrot[ed]" Plaintiff's assertions was "germane," and provided a sufficient basis for discounting her assertions as well.

3. **ALJ's RFC Assessment**

Plaintiff contends that the ALJ here failed to properly evaluate medical evidence concerning his ability to use his hands.  He asserts that the ALJ failed to resolve "the inconsistencies between the unanimous opinions of the doctors who have examined the plaintiff since he stopped working and her stated conclusions regarding his ability to use his hands." Plaintiff also contends that the ALJ erred in failing to properly assess his ability to "sustain[] work activity for 8 hours a day, 5 days a week and 'discuss' [his] abilities on a continuing basis." He asserts that the ALJ did not properly consider the effects of his chronic pain on his concentration, stamina, and pace.

A careful review of the ALJ's opinion and relevant portions of the medical record does not support these assertions.  The ALJ supported her RFC assessment with a thorough review of the medical record, and fully explained her conclusions regarding Plaintiff's functional capacity. The lifting and carrying limitations she imposed were consistent with medical opinion and the limitation to occasional pushing and pulling was fully supported by the medical record.  The ALJ's conclusion that Plaintiff could perform handling and fingering "frequently, but not constantly" was consistent with Dr. Brewster's finding that Plaintiff could perform fingering and feeling frequently and handling occasionally with his right hand, and could perform all hand functions frequently with his left hand.

Even if the ALJ had erred in her assessment of Plaintiff's ability to use his hands, and Plaintiff was limited to only occasional performance of all hand manipulations, that error was

harmless in light of the VE's testimony that the guard/security position did not require fingering

and feeling, and required only occasional reaching and handling.  The ALJ noted that the VE's

evaluation of the manipulative requirements of guard/security position differed from those set out

in the DOT, and noted that the VE had explained why his opinion of the functional requirements

differed.  If the record "contains persuasive evidence to support" a contradiction between the

VE's testimony and the DOT, an ALJ may rely on a VE's testimony.  Johnson v. Shalala, 60 F.3d

1428, 1435-36 (9th Cir. 1995).  The VE's testimony that his different assessment was based upon

"contacts with employers through labor market research and onsite job analysis for this position"

was such evidence.  Accordingly, if the ALJ erred, as Plaintiff asserts, in her analysis of the

limitations in Plaintiff's use of his hands, that error was harmless.  See, e.g., Stout v.

Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless if it is "inconsequential to the

ultimate disability determination").

4. **ALJ's Step Five Findings**

In order to be accurate, an ALJ's hypothetical to a VE must set out all of a claimant's

limitations.  E.g., Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing Baugus v.

Secretary of Health & Human Services, 717 F.2d 443, 447 (9th Cir. 1983)).  If the assumptions

included in the hypothetical are not supported by the record, a VE's opinion that a claimant can

work does not have evidentiary value.  Id.

Plaintiff contends that the VE's testimony that Plaintiff could work in a guard/security

position, as a meter reader, and as a hotel clerk lacked evidentiary value because it was based

upon a hypothetical that did not include all of the limitations to the use of his hands.  For the

reasons set out in the discussion of the ALJ's RFC assessment above, I disagree.  The ALJ's

FINDINGS AND RECOMMENDATION - 24

vocational hypothetical set out all of Plaintiff's limitations supported by the record, and the ALJ

could rely upon the VE's testimony as to Plaintiff's capacity to work in the positions cited.

5. **Right to a Full and Fair Hearing**

Plaintiff contends that the ALJ refused to allow the VE to respond to his counsel's inquiry

concerning "the source of his conclusions that the job of guard security is unskilled work and

requires only occasional reaching and handling . . . to avoid the issue whether VE testimony can

be relied upon to meet the Commissioner's burden of proof that jobs exist in significant numbers

that the plaintiff can perform." He asserts that the ALJ did not discuss any documents his counsel

had submitted "which confirm that a basis <u>must</u> be established for allowing expert testimony nor

the information that he submitted which establishes that there is no way to determine how many

jobs there are in any given DOT code." Plaintiff notes that his counsel had sent the ALJ a copy of

a letter from the Bureau of Labor Standards of the United States Department of Labor (DOL)

stating that the DOL considered the DOT obsolete. The letter stated that the DOL no longer used

the DOT to determine the number of jobs that existed in any particular "DOT code," but instead

relied on the Occupational Information Network, which reflected the 2000 Standard Occupational

Classification (SOC) system.

Plaintiff asserts that his counsel had sent the ALJ a letter dated June 5, 2009, asking her to

issue a Subpoena Duces Tecum to the VE who would testify at his hearing "to insure the VE

brought documents on which the VE would rely in forming opinions during the course of the

hearing." He adds that his counsel also wrote the ALJ a letter of the same date citing decisions of

the United States Supreme Court "wherein the Court concluded that expert testimony is not ipso

facto admissible, and citing factors necessary to constitute a foundation for such testimony."

Plaintiff notes that, at the hearing, the VE testified that an individual with the RFC that the ALJ assessed could work in a guard/security position, and that, though the SOC/DOT indicates that this work requires frequent reaching and handling, his own labor market research indicates that only occasional reaching and handling are required.  He notes that the VE further testified that, though the DOT characterizes the guard/security as an SVP 3 position, his own research indicates that it is "tantamount to SVP two, unskilled work."  Plaintiff adds that his counsel received a letter from the Oregon Employment Department (OED) written in August, 2006 indicating that only 1 of 7 security guard listings was an SVP 2 position, and received a letter from the OED dated May 13, 2011, stating that security guard positions were then listed at SVP 4 through 6.  He asserts that this information contradicts the VE's assertion that the security guard position is an SVP 2 position "and means that there is no unskilled security guard work, and hence no work that an individual such as the plaintiff limited to occasional manipulation and with no transferable skills could perform."

Plaintiff contends that, in failing to address these issues and refusing to require the VE "to articulate the basis for the skill levels and job numbers he cited" the ALJ denied his right to a "full and fair hearing on the issue of his disability . . . ."

I disagree.  Though the DOT "creates a rebuttable presumption as to . . . job classification," Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008), as noted above an ALJ may rely upon expert testimony that contradicts that source if "the record contains persuasive evidence to support the deviation."  Johnson, 60 F.3d at 1435-36 (9th Cir. 1995).  In support of her conclusion that Plaintiff could perform work that existed in substantial numbers in the national economy, the ALJ here cited the VE's testimony concerning "labor market surveys of those occupations which he has conducted over the last 27 years."  A Vocational Expert's "recognized

expertise provides the necessary foundation for his or her testimony," and "no additional foundation is required."  Bayliss v. Barnhart, 427 F.3d 678, 681 (9th Cir. 1993).  The ALJ's testimony was therefore "persuasive evidence" supporting the difference between his assessment and information in the DOT.

## Conclusion

A judgment should be entered affirming the Commissioner's decision denying Plaintiff's applications for benefits and dismissing this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due May 14, 2012.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 26th day April, 2012.

  /s/ John Jelderks                                    
John Jelderks
U.S. Magistrate Judge

FINDINGS AND RECOMMENDATION - 27